IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TRITON MARINE FUELS, LTD.          *
                                    *
        v.                          *      Case No.: JFM-06-CV-3346
                                    *
M/V PACIFIC CHUKOTKA                *
                                    *
                                  ****

OPINION

Triton Marine Fuels Ltd., S.A. ("Triton") has moved—in response to *Triton Marine Fuels Ltd. v. M/V Pacific Chukotka*, 575 F.3d 409 (4th Cir. 2009) ("*Triton II*")—for summary judgment and monetary judgment pursuant to Federal Rules of Civil Procedure 54 and 58. This motion is granted in part and denied in part. Triton is awarded a monetary judgment of $260,400, plus pre-judgment interest at a rate of 2.34 percent. Triton's request for attorneys' fees is denied.

FACTS AND PROCEDURAL HISTORY

In late 2006, Triton, a Panamanian corporation, brought an *in rem* action against the M/V Pacific Chukotka ("the Vessel"), a vessel registered in Malta and owned by Green Pacific A/S ("Green Pacific"). *Triton Marine Fuels Ltd. v. M/V Pacific Chukotka*, 504 F. Supp. 2d 68, 69 (D. Md. 2007) ("*Triton I*"), *overruled by Triton II*, 575 F.3d. Triton alleged it possessed a maritime lien over the Vessel after it supplied the Vessel with fuel and was never paid. *Id.*

The material facts of this case are not in dispute. *Triton II*, 575 F.3d at 411. Emerald Reefer Lines, Ltd. ("ERL") sub-chartered the Vessel from Intertransport Company LLC ("Intertransport"), a Russian company which had chartered the Vessel from Green Pacific. *Triton I*, 504 F. Supp. 2d at 69. ERL purchased fuel from Triton, which was delivered to the Vessel in

1

Odessa, Ukraine between August 3 and August 5 of 2006. *Id.* ERL never paid for the fuel and is now insolvent. *Id.*

Triton and ERL agreed upon a price of $260,400 for the fuel. (Mot. of Triton Marine Fuels, Ltd., S.A. for Entry of Summ. J. and Monetary J. Pursuant to Fed. R. Civ. P. 54 and 58 ("Pl.'s Mot.") 2; *see* Mem. in Support of Mot. for Summ. J. as to In Rem Claim of Triton Marine Fuels, Ltd., S.A. ("GP Mem. for Summ. J") 5.) The contract governing this transaction, "the Bunker Confirmation," stipulated that payment be made within ninety days of delivery and that "Overdue Payments shall be subject, at Seller's sole discretion, to a service charge at the rate of 2% per thirty day period or the maximum rate permitted under applicable law, whichever is less." (Pl.'s Mot., Ex. 1.) It further stated that Seller will have a lien on the Vessel to include "interest, legal costs, and any other ancillary costs attendant upon enforcement of this contract and/or Seller's lien." (*Id.*) Furthermore, the Bunker Confirmation provided that the transaction "shall be governed and construed in all particulars by the laws of the United States of America, and the parties hereby agree to the jurisdiction of United States District Courts." (*Id.*).

After Triton's suit was commenced, the Vessel was arrested in the Port of Baltimore. *Id.* at 70. Triton agreed to the release of the Vessel in exchange for Green Pacific posting a $390,000 security in the court registry. (Green Pacific's Mem. in Opp. to Pl.'s Mot. ("GP's Mem.") 7–8.) Bunker Holdings, Ltd. ("Bunker Holdings") intervened in the suit, alleging *in personam* claims of unjust enrichment and conversion against Green Pacific. (*See* GP's Mem. at 6.) Green Pacific posted a "special bond" for Bunker Holdings' claims totaling $307,500. (*Id.*) Bunker Holdings' *in personam* claims against Green Pacific were later dismissed by this Court. *See Triton I*, 504 F. Supp. 2d at 73.

In 2007, both Triton and Green Pacific filed motions for summary judgment. Green Pacific argued that the choice-of-law provision in the Bunker Confirmation was unenforceable because Green Pacific was not party to that contract, and therefore a maritime lien did not arise under the Federal Maritime Lien Act ("FMLA"), 46 U.S.C. § 31342. (GP Mem. for Summ. J at 1–2.) Triton responded that the choice-of-law provision was enforceable and therefore "[a] maritime lien was created as a matter of law by virtue of providing necessaries to the vessel under General Maritime Law and pursuant to [the FMLA]." (Pl.'s Response in Opp. to Def. Green Pacific A/S' Mot. for Summ. J. as to in Rem Claim of Triton Marine Fuels, Ltd S.A. and Cross Mot. for Summ. J. ("Pl.'s 2007 Mot. for Summ. J.") 1.) Triton's motion for summary judgment made no explicit mention of enforcing the interest rate or attorneys' fees provisions, though it argued generally for the enforceability of the Bunker Confirmation's "Terms and Conditions" to support its argument that the choice-of-law provision applied. (*See id.* 4–7.)

This Court granted Green Pacific's motion, and denied Triton's. This Court held that, assuming *arguendo* that the choice-of-law provision was enforceable, the United States lacked sufficient interest in the transaction because it "involve[d] the provision of goods by a foreign plaintiff to a foreign flag vessel in a foreign port[,]" and therefore "the FMLA is not to be applied extraterritorially to confer a maritime lien upon the plaintiff." *Triton I*, 504 F. Supp. 2d at 71, 73.

The Fourth Circuit reversed and remanded with instructions to enter summary judgment for Triton. *Triton II*, 575 F.3d at 411. First, the Fourth Circuit held that the Bunker Confirmation's choice-of-law provision was enforceable in the *in rem* action against the Vessel. *Id.* at 412–13. Second, it held that a maritime lien arose in Triton's favor because the FMLA may in fact be extended to create liens for foreign companies supplying necessaries in foreign ports,

and there is "no problem of extraterritoriality . . . because there are a significant number of ties between the United States and the transaction at issue." *Id.* at 412, 417–20. The Fourth Circuit issued a Mandate declaring that its judgment took effect on September 2, 2009.

On September 22, 2009, Triton filed a Motion for Entry of Summary Judgment and Monetary Judgment Pursuant to Federal Rules of Civil Procedure 54 and 58. This motion asks this Court to award Triton (1) $260,400 for the agreed-upon price of the fuel, (2) $171,864 for pre-judgment interest at the two percent monthly rate set forth in the Bunker Confirmation,[1] and (3) $222,825.77 for legal fees. (Pl.'s Mot. at 2–3.) Because this request totals $622,089.77, well in excess of the $390,000 security posted by Green Pacific, Triton also filed a motion opposing disbursement of the $307,500 security posted by Green Pacific for Bunker Holdings' *in personam* claims. (Mot. to Reconsider Order Disbursing Fund from Court Registry.) Triton seeks to recover some of the aforementioned damages from this security. (Reply Mem. of Triton Marine Fuels, Ltd., S.A., in Support of Monetary J. ("Pl.'s Reply").)

<u>ANALYSIS</u>

I.   <u>The Scope of the Fourth Circuit's Decision on Summary Judgment</u>

Triton asserts that the Fourth Circuit already decided that Triton was entitled to (1) the $260,400 principal, (2) $171,864 for the contractual pre-judgment interest rate, and (3) $222,825.77 for legal fees. Triton points out that its Verified Complaint sought a determination that it had a lien over the vessel "in the principal amount of $260,400, contractual interest at the rate of $5,280 per month, plus attorneys' fees and costs." (*Id.* at 1.) Triton argues that, since its

---

[1] Triton arrives at this figure by alleging that thirty-three months past between the due date of payment (November 2, 2006) and the Fourth Circuit's judgment (September 2, 2009). (Pl.'s Mot. 2–3.) Thirty-three times two percent of the principal $260,400 equals $171,864.

motion was *not* a *partial* motion for summary judgment, the Fourth Circuit "granted summary judgment to Triton on the entire claim [including all of the contractual damages]." (*Id.* at 2.) Additionally, Triton argues that the Fourth Circuit already decided that the lien encompasses all the terms of the Bunker Confirmation when it held that the Vessel was bound by the choice-of-law provision. (*Id.* at 3–6.)

The mandate rule prevents a district court from, on remand, "considering questions that the mandate of a higher court has laid to rest." *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007); *accord Invention Submission Corp. v. Dudas*, 413 F.3d 411, 414–15 (4th Cir. 2005). This rule "prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an earlier appellate decision in the same case." *Negron-Almeda v. Santiago*, 579 F.3d 45, 50 (1st Cir. 2009); *see also Wheeler*, 746 F.2d 1437, 1440 (11th Cir. 1984). "To determine the scope of the mandate, it is appropriate indeed often necessary, to look to the court of appeals' opinion." *Wheeler*, 746 F.2d at 1440; *accord City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 347 n.25 (D.C. Cir. 1977).

First, Triton's argument that the Fourth Circuit already granted Triton's request for attorneys' fees and interest, simply because that request was in its Verified Complaint, is unpersuasive. *Triton II*, by granting summary judgment, neither implicitly nor explicitly endorsed the specific requests for damages included in Triton's complaint.

Whether the Fourth Circuit in fact decided that the lien encompassed all the terms of the Bunker Confirmation is a more difficult question. *Triton II* did not explicitly resolve this issue. However, Triton's motion for summary judgment asserted generally that the Bunker Confirmation's "Terms and Conditions" were enforceable, (*see* Pl.'s 2007 Mot. for Summ. J. at

4–7), *and* the Fourth Circuit used language suggesting that all the terms of the Bunker Confirmation were covered by the lien. *Triton II*, 575 F.3d at 414 ("conclude[ing] ERL had the authority to bind the Vessel to the provisions of the Bunker Confirmation . . . ."). Furthermore, the Fourth Circuit stressed the "the long-recognized principle of honoring the expectations of the parties . . . ." *Id.* at 415 (quoting *Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1123 (9th Cir. 2008)).

On the other hand, Triton's motion for summary judgment never asked for an award of attorneys' fees or interest as set forth in the Bunker Confirmation. Accordingly, the actual issue before the court was only whether the choice-of-law provision was enforceable. Nor does the Fourth Circuit's actual holding—that the choice-of-law provision was enforceable, an FMLA lien for necessaries attached, and summary judgment was warranted—implicitly require a finding that the lien covers the attorneys' fees and interest provisions of the Bunker Confirmation. As a result, this Court holds that the Fourth Circuit did not decide the issue of whether Triton was entitled to attorneys' fees and contractual interest as set forth in the Bunker Confirmation.

II.     The Value of the FMLA Lien

Since the Fourth Circuit did not already decide the contractual attorneys' fees and interest issues, this Court now turns to analyzing what damages Triton is entitled to.

The FMLA[2] "provides that 'a person providing necessaries to a vessel . . . has a maritime lien on the vessel.'" *Gulf Marine & Indus. Supplies v. Golden Prince*, 230 F.3d 178, 180 (5th

---

[2] There is some confusion about whether 46 U.S.C. § 31342 is still called the "Federal Maritime Liens Act" (FMLA) or whether it is now referred to as part of the "Commercial Instruments and Maritime Liens Act" (CIMLA). *See Ceres Marine Terminals, Inc. v. M/V Harmen Oldendorff*, 913 F. Supp. 919, 922 n.2 (D. Md. 1995).

Cir. 2000); *accord* 46 U.S.C. § 31342(a)(1)–(2); *Triton II*, 575 F.3d at 417. Necessaries are goods and services "reasonably needed in the ship's business, such as [those] that are useful to the vessel, keep her out of danger, and enable her to perform her particular function." *Bradford Marine, Inc. v. M/V "Sea Falcon"*, 64 F.3d 585, 589 (11th Cir. 1995) (internal citations and quotation marks omitted). The FMLA specifically defines necessaries "as including 'repairs, supplies, towage, and the use of a dry dock or marine railway.'" *Triton II*, 575 F.3d at 414 n.2 (quoting 46 U.S.C.A. § 31301(4)).

A maritime lien is an unusually strong remedy as to which, unlike a common law lien, "[t]he vessel itself is viewed as the obligor whether or not the owner is also obligated." *Bominflot, Inc. v. The M/V Henrich S*, 465 F.3d 144, 146 (4th Cir. 2006). It is "*stricti juris* and cannot be created by agreement between the parties[.]" *Id.* A maritime lien is enforced in an *in rem* action, which "is limited to the value of the lien itself." *Bradford Marine*, 64 F.3d at 588–89; *see also Bominflot*, 465 F.3d at 146 (quoting Griffith Price, The Law of Maritime Liens 1 (1940)).

a.  Whether the Lien Covers *All* Terms and Conditions of the Bunker Confirmation

Triton argues that the value of a lien under the FMLA includes all the terms of the underlying contract for necessaries. (Pl.'s Reply at 6, 13.)

First, Triton points to cases holding that when maritime liens are created by a mortgage, those liens cover all terms, including attorneys' fees and interest rate agreements, of the underlying mortgage contract. *See Transamerica Commercial Fin. Corp. v. F/V Smilelee*, 944 F.2d 186 (4th Cir. 1991); *Gen. Elec. Credit Corp. v. Oil Screw Triton*, 712 F.2d 991 (5th Cir. 1983). This analogy is unconvincing. Cases concerning mortgage liens arising out of mortgages

"are not directly applicable to [a case involving an FMLA lien for necessaries], and [courts] cannot blindly apply them in light of the text of Section 31342 and the history of liens for necessaries." *See Bradford Marine*, 64 F.3d at 589–90.

Second, as discussed in Section I, Triton asserts that *Triton II* held or at least supports the contention that the lien covers *all* the terms and conditions in the underlying contract for necessaries (and that cases to the contrary are now "obsolete"). (Pl.'s Reply at 13.) The language of *Triton II* supports Triton's argument. *See supra* Section I. The Fourth Circuit *suggested* that the Vessel was bound to all the terms of the necessaries contract. Nonetheless, for similar reasons to those discussed in Section I, this opinion should not be read as definitely resolving that an FMLA lien covers *all* the terms of the underlying contract.

Multiple courts have held that an FMLA lien does *not* necessarily cover all the terms of the underlying contract, and Triton fails to cite to a single case expressly holding otherwise. *See Bradford Marine*, 64 F.3d at 589–90 (creditor's attorneys' fees could not be recovered via FMLA maritime lien, even though underlying contract included agreement to pay the attorneys' fees); *Gulf Marine & Indus. Supplies, Inc. v. M/V Golden Prince*, 1999 WL 670997, *4 (E.D. La. 1999) (lien for necessaries does not cover interest rate set out in the contract); *Sunrise Shipping, Ltd. v. M/V Am. Chemist*, 1999 WL 22857, *1 n.e (E.D. La. 1999) (Preliminary Rankings of Claims) (refusing to award provider of domestic necessaries with interest rate, set out in the contract for necessaries under a maritime lien); *J.P. Provos Mar. v. M/V Agni*, 1999 WL 558151, *2 (E.D. La. 1999) (holding that lien does not cover attorneys' fees, even though the underlying contract included an agreement to pay attorneys' fees); *James Creek Marina*, 964 F. Supp. at 23 (in calculating how much bond required to release an arrested vessel, holding that attorneys' fees

should not be included in the bond because they cannot be accessed by a maritime lien, even though the underlying contract included agreement to pay attorneys' fees).

In light of the aforementioned case law, it seems imprudent to read the Fourth Circuit's decision as definitively resolving this issue without an express statement or holding to that effect.[3] This Court chooses to follow what appears to be the majority view that the terms in the underlying contract for necessaries are not automatically covered by the resulting lien. Rather, although this Court has found no case law expressly putting it in these words, a maritime lien under the FMLA appears to only cover the price of the necessaries themselves plus interest. *Cf. Bradford Marine*, 64 F.3d at 589 (noting that attorneys' fees—where contract for necessaries included an agreement to pay attorneys' fees—may only be charged "against the [vessel] *in rem* . . . if the fees . . . were (1) 'necessaries' and (2) provided to the [vessel]."); *James Creek Marina*, 964 F. Supp. at 23 (noting that lien for necessaries "must be based only on the amount of plaintiff's claim, 'fairly stated,' for the overdue boat storage fees and other storage-related costs[]" and not including attorneys' fees as set out in the necessaries contract).

   b.   Damages Covered by the Lien

Since the lien does not cover all the terms of the Bunker Confirmation, the question becomes what Triton's lien does cover. Because an FMLA lien only covers the price of the necessaries themselves, the answer to this question involves two interrelated questions: what

---

[3] Furthermore, if liens automatically covered all the terms of underlying necessaries contracts, suppliers and charterers of vessels could potentially expand the use of this drastic remedy to secure payment for services which Congress never intended the FMLA to cover. For example, a creditor providing both necessaries and non-necessary supplies to a vessel could recover payment for the non-necessaries with an FMLA lien by contractually tying payment for the non-necessaries to it agreement to supply necessaries. Similarly, guaranteeing that the lien covers all terms of the underlying contract seems inconsistent with the rule that liens "cannot be created by agreement between the parties." *See Triton II*, 575 F.3d at 416.

necessaries did Triton provide to the Vessel and what price is Triton entitled to in exchange for those necessaries.

### i.   The $260,400 Principal

Fuel is a necessary, $260,400 is the agreed upon price of that necessary, and therefore the lien under the FMLA covers the $260,400. Green Pacific does not seem to seriously contend otherwise. (*But cf.* GP's Mem. at 1 n.1 ("By filing this Opposition, Green Pacific does not consent or agree to Triton's entitlement to the underlying principal amount of $260,400, or waive its right to dispute that issue or any other issues decided by the Fourth Circuit in this case, by way of [Petition for Cert].").)  Accordingly, this Court awards Triton $260,400 from the $390,000 bond in the court registry.

### ii.   Attorneys' Fees and the Cost of Enforcement

The FMLA lien does not cover, and Green Pacific should not be assessed for, the attorneys' fees Triton incurred collecting on this lien.

First, the attorneys' fees in this case are not themselves necessaries. *See Bradford Marine*, 64 F.3d at 589–90; *Am. Oil Trading, Inc. v. M/V Sava*, 47 F. Supp. 2d 348, 353 (S.D.N.Y. 1999). "Since Congress enacted the FLMA, courts have consistently held that legal services are not necessaries." *Gulf Marine & Indus. Supplies*, 230 F.3d at 180–81. These fees to collect a debt for necessaries did not help the Vessel function. *See Bradford Marine*, 64 F.3d at 589; *J.P. Provos Mar.*, 1999 WL at *2 ("[T]he court finds that legal services for the collection of a debt for necessaries are not for the benefit of the vessel, and thus they are not necessaries subject to a maritime lien[.]"); *James Creek Marina v. Vessel My Girls*, 964 F. Supp. 20, 23 (D.D.C. 1997) (in determining how much bond must be posted to release an arrested vessel,

holding that attorneys' fees—incurred by creditor trying to collect debt for necessaries—were not necessaries). In fact, these legal services were not even provided to the Vessel, but rather were provided to Triton. *See Bradford Marine*, 64 F.3d at 589.

Second, this court is not persuaded by Triton's "part of the price" argument. Similar to its theory that the lien covers all the terms of the underlying contract, Triton asserts that the lien covers attorneys' fees because they are "part of the price" of the fuel just the same as the $260,400 principal.[4] There is some merit to this contention. Simply because a contract term is not monetized, does not necessarily make it any less "part of the price." Triton argues that just as "attorney's fees and costs . . . stipulated in [ship] mortgage contract[s], may be validly recovered as part of the mortgage indebtedness secured," *see Gen. Elec. Credit Corp.*, 712 F.2d at 994, so too must attorneys' fees stipulated in necessaries contracts be validly recovered as part of the indebtedness for the necessaries. (*See* Pl.'s Reply at 14.) Accepting this theory would further the FMLA's purpose of "encourag[ing] private investment in the maritime industry"[5] by increasing the ability of necessaries providers to recoup *all* their costs if a vessel fails to pay its bill.

All that said, federal precedent weighs against accepting the "part of the price" argument. First, Triton is unable to cite a single court that has accepted this argument. Second, at least one court seems to have expressly rejected it. *See Gulf Marine & Indus. Supplies*, 1999 WL at *4 (though unclear whether contract provided for vessel to pay attorneys' fees, rejecting "the novel argument that attorneys' fees are essentially 'part of the price in consideration for furnishing the necessary.'"). Finally, though not expressly addressing the "part of the price" argument, federal courts have consistently rejected efforts to use FMLA liens to cover attorneys' fees incurred by

---

[4] In other words, Triton asserts it provided fuel in exchange for (1) the $260,400 principal *and* (2) the Vessel's promise to pay attorneys' fees and other costs, such as contractual interest, if the need arose.
[5] *Gulf Marine & Indus. Supplies*, 230 F.3d at 181 (internal quotations and citations omitted); *see also Redcliffe Americas Ltd. v. M/V Tyson Lykes*, 996 F.2d 47, 49–50 (4th Cir. 1993).

creditors in seeking to recover a debt for necessaries, even where the underlying contract included an obligation to cover these fees. *See Bradford Marine*, 64 F.3d at 589–90 (holding that creditor's attorneys' fees—incurred to collect debt for necessaries—could not be recovered via FMLA maritime lien, even though the contract for the necessaries included agreement to pay the attorneys' fees); *J.P. Provos Mar.*, 1999 WL at *2 ("[T]he court finds that [contractually agreed attorneys' fees] for the collection of a debt for necessaries are not for the benefit of the vessel, and thus they are not necessaries subject to a maritime lien[.]"); *James Creek Marina*, 964 F. Supp. at 23 (in calculating how much bond must be posted to release an arrested vessel, holding that attorneys' fees, incurred collecting debt for necessaries, should not be included in the bond amount because they cannot be accessed by a maritime lien, even though the contract for the necessaries included agreement to pay attorneys' fees).

Obviously, none of this precedent is binding on this Court. Nonetheless, accepting the "part of the price" theory would extend a drastic remedy, an FMLA maritime lien, to thus far unprecedented lengths. Consequently, despite the logical appeal of Triton's argument, this Court rejects Triton's effort to recover attorneys' fees under the "part of the price" theory.[6]

Moreover, even if contractual attorneys' fees were recoverable under an FMLA lien, the Bunker Confirmation does not in fact cover those fees. Although this Court found no case law expressly applying this principle under United States maritime law, contractual stipulations for attorneys' fees are generally strictly construed. *See, e.g.*, *U.S. Fidelity and Guar. Co. v.*

---

[6] Green Pacific also asserts Triton violated Rule 54 by failing to move for attorneys' fees within fourteen days of entry of the judgment. (GP's Mem. at 2); *see* FED. R. CIV. P. 54(d)(2)(B)(i) (a "motion [for attorney's fees] must . . . be filed no later than 14 days after the entry of judgment"). Triton counters that *Triton II*'s judgment did not take effect until September 21, just a day before Triton filed its Rule 54 motion. Green Pacific correctly points out, however, that Triton confuses *Triton II*'s mandate with the Fourth Circuit's mandate regarding Bunker Holdings' *in personam* claims, and that *Triton II*'s mandate, effectuating its judgment, was actually filed on September 2. *Triton II*, MANDATE, No. 07-1908 (4th Cir. Sept. 2, 2009). That said, this Court need not decide this issue.

*Braspetro Oil Serv. Co.*, 369 F.3d 34, 75 (2d Cir. 2004) (interpreting New York law) (internal

citations and quotations omitted); *Days Inn Worldwide, Inc. v. BFC Mgmt., Inc.*, 544 F.Supp.2d

401, 408 (D.N.J. 2008) (interpreting New Jersey law). As the Second Circuit has said in

interpreting New York law, a "court should not infer a party's intention to waive the benefit of

the American Rule unless the intention to do so is *unmistakably clear* from the language of the

promise." *U.S. Fidelity and Guar.*, 369 F.3d at 75 (internal citations and quotations omitted)

(emphasis in original); *see also Nova Research, Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275,

287 (Md. 2008) (interpreting Maryland law) (noting "the generally accepted rule, requiring that a

contract provision must call for fee recovery expressly for establishing the right to indemnity in

order to overcome the application of the American rule."). I see no reason to avoid applying this

principle to a maritime contract. *Cf. Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 834

(4th Cir. 1998) ("When no federal statute or well-established rule of admiralty exists, admiralty

law may look to the common law or to state law, either statutory or decisional, to supply the rule

of decision.").

The Bunker Confirmation included a provision covering "legal costs, and any other

ancillary costs attendant upon enforcement." (Pl.'s Mot., Ex. 1.) Neither "legal costs," nor

"ancillary costs attendant upon enforcement," nor the combination of the two, makes it

"unmistakably clear" that the contract covers attorneys' fees. Regardless of whether the magic

words "attorneys' fees" are required, Triton should have at least drafted the clause more clearly

if it wanted the Vessel to be liable for attorneys' fees.[7] *See U.S. Fidelity and Guar.*, 369 F.3d at

---

[7] At the motions hearing, Triton argued that, as a foreign company, its lawyers responsible for drafting the Bunker Confirmation may not have appreciated that attorneys' fees stipulations are generally strictly construed in the United States. However, Triton, presumably through those very same lawyers, agreed to a United States choice-of-law provision, and appropriately sought to enforce that provision. Having successfully sought to reap the benefits of the United States maritime law of liens, Triton cannot now seek to avoid aspects of United States law it finds inconvenient or undesirable.

77–78 (interpreting New York law and holding that term requiring indemnification for "legal costs" does not cover attorneys' fees); *Woodhaven Homes & Realty, Inc. v. Hotz*, 296 F.3d 822, 825 (7th Cir. 2005) (holding, under Wisconsin law, that indemnification contract covering "any and all litigation arising out of copyright claims" did not cover attorneys' fees because it "made no mention of attorney fees"). *But cf. Nova Research*, 952 A.2d at 285 (Maryland law does not require contract to include magic words "attorneys' fees" to nonetheless require a party to pay attorneys' fees.); *Atl. Contracting & Material Co. v. ULICO Cas. Co.*, 844 A.2d 460, 478–79 (Md. 2004) (thought not discussing the precise contractual language, holding that an indemnity contract provision requiring a party to pay for sums incurred to enforce the agreement covered attorneys' fees).

### iii.   Pre-Judgment Interest

An FMLA lien covers, and Green Pacific should be assessed for, at least some pre-judgment interest. This Court has discretion to award pre-judgment interest under an FMLA maritime lien, and granting such an award is "almost automatic." *Ceres Marine Terminals*, 913 F. Supp. at 929; *see also Am. Oil Trading*, 47 F. Supp. 2d at 353 (quoting *Magee v. United States Lines, Inc.,* 976 F.2d 821, 822 (2d Cir.1992)). Awarding pre-judgment interest ensures necessaries providers are fully compensated for their loss "while keeping ships in commerce." *J.P. Provos Mar.*, 1999 WL at *2 (quoting *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 105 (1995)).

However, a maritime lien for necessaries does not necessarily cover the *contractual* pre-judgment interest rate. *See Gulf Marine & Indus. Supplies*, 1999 WL at *4 (emphasis added); *Sunrise Shipping*, 1999 WL at *1 n.e (Preliminary Rankings of Claims) (where various creditors

with liens were competing for a limited supply of money, refusing to award provider of domestic

necessaries with contractual interest rate under a maritime lien and noting "courts have

consistently held that even if a claimant has a contractual right to collect interest, parties to an *in*

*rem* action may only collect prejudgment interest at the statutory rate"); *Galveston Yacht Serv.,*

*Inc. v. The Yacht Patricia*, 1981 WL 463, *2 (S.D. Tex. 1981) (dicta) ("Even where parties in

this action have entered into a contract expressly providing for interest on amounts due

thereunder, it is doubtful whether the maritime lien [for providing necessaries under the FMLA]

asserted would encompass a claim for such interest.").[8] *But cf. Sec. Pac. Bank of Wash. v. Sept.*

*Morn*, 754 F. Supp. 813, 815 (W.D. Wash. 1990) (awarding pre-judgment interest at contractual

rate of one and one-half percent out of FMLA maritime lien). Rather, a district court may award

pre-judgment interest at the rate required to fully compensate the necessaries provider for its

loss. *See Gulf Marine & Indus. Supplies*, 1999 WL at *4 (internal citations and quotations

omitted) (holding that lien entitled necessary provider to statutory rate of interest, not the higher

contractual rate, and noting "the essential rationale for awarding prejudgment interest is to ensure

an injured party is fully compensated for its loss"); *J.P. Provos Mar.*, 1999 WL at *2 (rejecting

argument that "federal judicial rate" or "statutory rates" (lower rates) should be awarded instead

of eight percent rate: eight percent "ensures that an injured party is fully compensated for its

loss").

---

[8] *Cf. Inland Credit Corp. v. M/T Bow Egret*, 552 F.2d 1148, 1155 n.9 (5th Cir. 1977) ("The promissory notes' rate is
inapplicable, since [the lenders] are recovering by virtue of their status as lien claimants rather than on their notes.");
*J.P. Provos Mar.*, 1999 WL at *1–2 (holding that maritime lien, arising under the FMLA, did not cover interest rate
specified in the invoice for the necessaries because the invoice rate was "excessive" and a lower rate was "more
equitable" in light of competing liens for limited pot of money).

There is no reason in this case to deny pre-judgment interest to Triton. However, the two percent monthly interest rate is greater than necessary to compensate Triton for its loss.[9] *See Gulf Marine & Indus. Supplies*, 1999 WL at *4 (rejecting two percent-a-month contractual rate in favor of statutory rate). *But see Sec. Pac. Bank of Wash.*, 754 F. Supp. at 815 (holding FMLA maritime lien for necessaries covered prejudgment interest at contractual rate of one and one-half percent a month). Triton fails to explain how it suffered $171,864 in damages from the deprivation of $260,400 for thirty-three months. Whether this contractual rate was set to deter a breach or as a punitive measure, or both, it is not an accurate reflection of Triton's loss.

Instead, this Court accepts Green Pacific's recommendation and will assess pre-judgment interest at the three-month average Treasury bill rate of 2.34 percent.[10] In determining pre-judgment interest where no contractual rate exists, "[t]he Second Circuit has suggested as a benchmark 'short-term, risk free obligations.'" *Loginter S.A. Y Parque Industrial Agua Profunda S.A. v. M/V Nobility*, 177 F. Supp. 2d 411, 421 (D. Md. 2001) (quoting *Ingersoll Milling v. Bodena*, 829 F.2d 293 (2d Cir. 1987)). Following that guidance, Judge Nickerson, in a case where no contractual interest rate existed, applied the three-month average Treasury bill rate to value an FMLA lien. *Id.* at 421–22; *see also Bruzzone Consol. Inc v. M/V Blue Eagle*, 713 F. Supp. 146, 153 (D. Md. 1989) (Niemeyer, J.). Having decided that the contractual rate is excessive and should not be utilized, I see no reason to depart from this reasoning in determining

---

[9] I also reject any argument that the contractual interest rate is "part of the price" of the necessaries for the same reasons I rejected that argument's application to recovering attorneys' fees under a contractual provision.

[10] Examining the Federal Reserve web site (http://www.federalreserve.gov/releases/H15/data.htm), this Court was unable to confirm that 2.34 percent is in fact the three-month Treasury bill average rate. I raised this issue with counsel at the motions hearing, and Triton indicated that it trusted Green Pacific's representation that 2.34 percent was in fact the three-month Treasury bill average rate and that that particular rate was a reasonable one (assuming the Court denied its request for contractual interest). As a result, this Court assumes that 2.34 percent is the appropriate rate.

the appropriate rate. Applying a rate based on "short-term, risk free obligations" fairly compensates Triton for its loss of the price of the necessaries.

In sum, this Court holds that the value of the FMLA lien is the principal ($260,400) plus the 2.34 percent rate of interest and will assess that value from the $390,000 security in the court registry.

III.   General Maritime Law: All Maritime Contracts Create Liens

Triton also asserts that "general maritime law," separate and apart from the FMLA, "independently granted maritime lien status" to all provisions of the Bunker Confirmation. (Pl.'s Reply at 10.) Triton explains:

> [E]ven if [the FMLA] [was] inapplicable, or if Triton's maritime contract were for some purpose other than provision of necessaries, application of U.S. law . . . gave rise to a lien in Triton's favor under the general maritime law of the United States, and the general maritime law would not permit the vessel to avoid those parts of the contract the vessel found inconvenient. (*Id.* at 12.)

Putting aside the issue of when a lien arises under general maritime law and what the contours of such a lien would be, Triton provides no support for the proposition that one attaches from a *contract for necessaries* entered into by a vessel's *subcharterer*. Triton cites a single unpublished district court opinion holding that a lien may arise under general maritime law even where an FMLA lien for necessaries also arises from the same transaction. *See N. of England Protecting and Indem. Assoc., Ltd. v. M/V Nara*, 1999 U.S. Dist. Lexis 22375, *5–8 (E.D. La. 1999). That case, however, involved a contract entered into by the vessel owner through an agent. *Id.* Additionally, the court's determination about the general maritime law lien relied solely on *Int'l Marine Towing, Inc. v. S. Leasing Partnership, Ltd.*, which merely held that a general maritime lien arose from the breach of a charter contract between a charterer and the

vessel's *owner*. 722 F.2d 126, 130–32 (5th Cir. 1983) (emphasis added). In fact, *Int'l Marine Towing* distinguished its facts from other cases where general maritime liens were rejected by noting "[w]e find that none of these cases involves breach of a bareboat charter by *the owner* and thus the cases are not controlling." *Id.* at 131 (emphasis added). Similarly, the other case Triton cites to support its general maritime law lien theory, *RR Caribbean v. Dredge "Jumby Bay"*, explained, "[u]nder general maritime law, a maritime lien arises in favor of a charterer if a vessel *owner* breaches a charter party that is at least partially performed . . . ." 147 F. Supp. 2d 378, 381 (D.V.I. 2001) (emphasis added) (citing 8 BENEDICT ON ADMIRALTY § 12.01[C][1][d][iii] (7th ed., rev. 2000)).

Regardless whether a general maritime law lien, separate and apart from an FMLA lien, may ever arise out of a contract for necessaries,[11] Triton cites no cases holding that one attaches from a contract to which the vessel's owner was not a party. Since the contract here was between ERL and Triton, not Green Pacific (the Vessel's owner), Triton's argument that it holds a general law maritime lien is unpersuasive.

IV.   This Court's Ability to Award a Judgment Exceeding $390,000

Even if Trion was entitled to a judgment exceeding $390,000 (which it is not), the circumstances of this case do not justify assessing a judgment in excess of the $390,000 security

---

[11] Triton suggests that because a general maritime law lien existed for foreign suppliers providing necessaries in foreign ports before the FMLA, that same general maritime law lien still exists today separate and apart from the FMLA. (*See* Pl.'s Reply at 1.)  However, Triton cites no cases that hold such a lien still exists, distinct from an FMLA lien, after enactment of the FMLA. In fact, in its 2007 motion for summary judgment, Triton itself asserted that the FMLA "essentially" codified the general maritime law of liens. (Pl.'s 2007 Mot. for Summ. J. at 9); *cf. Triton II*, 575 F.3d at 417–18 ("[T]he fundamental purposes underlying the FMLA have remained unchanged. The FMLA provides a single federal statute for the determination of maritime liens, and by providing this uniform scheme, the statute confers domestic suppliers of necessaries with the same lien rights as previously enjoyed only by foreign suppliers under the common law."); *Bradford Marine*, 64 F.3d at 588 ("The creation of a maritime lien for necessaries furnished to a vessel is governed by 46 U.S.C §§ 31341-31342.").

posted to release the Vessel. Two distinct inquiries underlie this analysis: (1) whether this Court may grant an *in personam* judgment against Green Pacific and (2) whether this Court may increase the amount of security Green Pacific has posted in this *in rem* action.[12]

First, it would be inappropriate in this case for this Court to exercise its power in equity to assess an *in personam* judgment against Green Pacific. "The traditional rule has been the admiralty court will not give a personal judgment against the owner in excess of the release bond." *Industria Nacional Del Papel v. M/V "Albert F"*, 730 F.2d 622, 626 (11th Cir. 1985). However, "[a] court of the admiralty has powers akin to those of a court of equity, and should not be hampered in its efforts to reach substantial justice by inexorable rules invoked by the claimant." *The Fairisle*, 76 F. Supp. at 33 (quoting *The Minnetonka*, 146 F. 509, 515 (2nd Cir. 1906)). The traditional rule has therefore been relaxed such that an admiralty court, using its equitable powers, may award an *in personam* judgment against a property owner, previously only subject to an *in rem* action, when the security posted is insufficient to cover the damages incurred. *See Savas v. Maria Trading Corp.*, 285 F.2d 336, 340 (4th Cir. 1960) (noting that where a ship has been released upon the filing of a security bond "which turns out to be insufficient to cover the damages incurred, the Libellant has been allowed to amend the libel so as to increase the claim for damages and obtain a decree in personam against the claimant for the excess"); *Hawkspere Shipping Co. Ltd. v. 65 Bundles of Secondary Aluminum*, 178 F. Supp. 2d 486, 491 (D. Md. 2001) (citing *Savas*, 285 F.2d; *The Fairisle*, 76 F. Supp. at 32) ("[C]ase law from this Court and the Fourth Circuit makes clear that a district court sitting in admiralty may

---

[12] That said, this area of admiralty law is not a picture of clarity. Some of the most relevant case law is unclear about whether these two inquiries are in fact distinct or actually amount to the same question. *See, e.g.*, *The Fairisle*, 76 F. Supp. 27 (D. Md. 1947).

enter judgment in excess of the value of the security, which may include a judgment against the owners of the property at issue in the *in rem* action."); *see also Industria Nacional*, 730 F.2d.

Although courts have used language suggesting wide latitude to award these *in personam* judgments, *see, e.g.*, *The Fairisle*, 76 F. Supp. at 34, courts in the Fourth Circuit have only actually granted *in personam* judgments against property owners in these situations under two sets of circumstances: (1) when the owner counterclaimed, thereby subjecting itself to *in personam* jurisdiction, or (2) where the court itself mistakenly underestimated the security required to cover the damages and the total damages did not exceed the value of the underlying property. *See Hawkspere Shipping*, 178 F. Supp. 2d at 491 (where parties agreed to the value of the security, holding that judgment in excess of amount of security posted may be assessed against vessel owner that filed counterclaims because "even if [they were] not validly served with process it should not be heard to say that the court had the power to decide in [their] favor but no power to render a decree against [them]"); *The Fairisle*, 76 F. Supp. at 34 (where creditor brought *in rem* claims against vessel owner, holding that judgment against owner could exceed amount of security because the court, not the parties, had determined the amount of security that was required and that security did not equal the total value of the vessel); *see also Industria Nacional*, 730 F.2d (refusing to permit *in personam* judgment against vessel owner in excess of security posted because both parties agreed to the initial security amount and there was no mistake about the value of the vessel); *Mosher v. Tate*, 182 F.2d 475, 478–79 (9th Cir. 1950) (permitting *in personam* judgment against vessel owner where trial court "erred in ordering the release of the vessel without requiring a sufficient bond"). *But see The Minnetonka*, 146 F. 509, 515 (2d Cir. 1906) (permitting *in personam* judgment against property owner when damages

exceeded security, despite the fact that amount of security had been determined by libellant's own claims of damages in the complaint).

The circumstances of this case do not compel this Court to grant an *in personam* judgment against Green Pacific. Green Pacific never counterclaimed against Triton, and Triton agreed to the amount of the security posted to release the Vessel. The alleged insufficiency of the security was caused by Triton's own failure to properly plan for lengthy litigation, not by the actions of this Court, or anyone else, outside of Triton's control.

Second, this Court should not block disbursement of the $307,500 special bond posted for Bunker Holdings' *in personam* claims against Green Pacific. Since Bunker Holdings' claims have been dismissed, refusing to disburse this special bond would be tantamount to increasing the security Green Pacific is required to post for Triton's *in rem* claim. Supplemental Rule E(6) of the Federal Rules of Civil Procedure states: "Whenever security is taken the court may, on motion and hearing, for good cause shown, reduce the amount of security given; and if the surety shall be or become insufficient, new or additional sureties may be required on motion and hearing." SUPP. ADMIRALTY & MAR. CLAIMS R. E(6). This rule prevents courts from increasing security absent fraud, misrepresentation, or a mistake of the court in calculating the security. *See Industria Nacional*, 730 F.2d at 626; *Hawkspere Shipping*, 178 F. Supp. 2d at 493; *cf. The Fairisle*, 76 F. Supp. at 32 (noting that since security stands in the place of a vessel, when it is posted "liens asserted against the vessel are discharged and cannot be revived in [an *in rem*] proceeding, and there can be no re-arrest for the same claim, unless the release of the vessel on bond has been secured by misrepresentation or fraud"). Triton does not allege any fraud, misrepresentation, or mistake of the court, and therefore the security cannot be increased and this Court should disburse the $307,400 special bond.

A separate order reflecting the rulings in this Opinion is being entered herewith.

DATE:   <u>11/30/2009</u>                              ___/s/_____

                                                                J. Frederick Motz

                                                                United States District Judge